IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

LEDELL LEE                                              PETITIONER

v.          CASE NUMBER 5:01CV00377JH

RAY HOBBS, Director of the
Arkansas Department of
Correction                                             RESPONDENT

## O R D E R

Before this Court are the following:

*   **Petition For Writ Of Habeas Corpus** (document #1);

*   **Response To Petition For Writ Of Habeas Corpus** (document #5);

*   **Amended Response To Petition For Writ Of Habeas Corpus** (document #89); and

*   **Petitioner's Traverse** (document #94),

and from said documents, and other matters and things appearing, the Court finds and orders as follows:

1.    Ledell Lee ("Lee") brought this habeas corpus proceeding under **28 U.S.C. §2254**, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  The matter is fully briefed and ripe for decision on the merits.

## PROCEDURAL HISTORY

2.    On February 9, 1993, twenty-six year-old Debra Reese was found murdered in her bedroom.  She had been beaten and strangled. Lee was arrested and charged with capital murder in the case.

3.    Lee was tried twice for the Reese murder.  The first trial ended in a hung jury in October, 1994.  Lee was convicted and sentenced to death in the second trial in October, 1995.  His conviction and sentence were affirmed on appeal.  **Lee v. State**, **327 Ark. 692, 942 S.W.2d 231 (Ark. 1997)**, *cert. den.* **522 U.S. 1002 ("Lee I").**  Where the Court refers to the Reese murder trial in this opinion, it has reference only to the second trial.

4.    Lee filed a petition for post-conviction relief pursuant to **Ark.R.Crim.P. 37** ("First Rule 37 Petition"), alleging that he had received ineffective assistance from his attorneys in the murder trial.   The trial court denied his petition, and this denial was affirmed on appeal.  **Lee v. State**, **343 Ark. 702, 38 S.W.3d 334 (Ark. 2001) ("Lee II").**

5.    Lee then filed the Petition For Writ Of Habeas Corpus ("Habeas Petition") now under consideration.  On April 2, 2003, United States District Judge George Howard, before whom the Habeas Petition was then pending, noted from the transcript of the hearing on the First Rule 37 Petition that Lee's attorney "may have been impaired to the point of unavailability on one or more days of the Rule 37 hearing."

Judge Howard ordered that the Habeas Petition be stayed and held in abeyance, and the matter "remanded for the trial court to take appropriate action to allow Lee to present relevant evidence and argument in favor of his Rule 37 petition issues."

6.   Judge Howard's remand order was appealed, and the Eighth Circuit affirmed.  **Lee v. Norris, 354 F.3d 846 (8th Cir. 2004).** The court said that "all of the claims alleged in [Lee's] petition had been exhausted," but that "one unexhausted claim" not in the Habeas Petition was raised by Judge Howard.  These circumstances were, in the Eighth Circuit's view, "truly exceptional," and justified Judge Howard in holding the Habeas Petition in abeyance and remanding.

The "unexhausted claim," as articulated by the Eighth Circuit, was whether Lee "had been deprived of his due process rights (as well as his state-law right to qualified post-conviction counsel) by the conduct of his appointed counsel during the post-conviction proceedings in the state courts." *Id.*

7.   Lee then moved the Arkansas Supreme Court to recall the mandate issued on appeal of the First Rule 37 Petition.  That court agreed, stating that "until [Lee] has been afforded a new Rule 37 proceeding, he has potential state claims that remain unexhausted." **Lee v. State, 367 Ark. 84, 89, 238 S.W.3d 52, 55 (Ark. 2006).**  The matter was remanded to the trial court for a new post-conviction proceeding.

8.   A new attorney was appointed to represent Lee, and a new Rule 37 petition ("Second Rule 37 Petition") was filed.  Like the First Rule 37 Petition, this one was also denied, and the denial was affirmed on appeal. **Lee v. State, 2009 Ark. 255, 308 S.W.3d**

**596 (Ark. 2009) ("Lee III").**

9.   On November 9, 2009, the United States Supreme Court denied *certiorari* to Lee in connection with the Second Rule 37 Petition. **Lee v. Arkansas, 558 U.S. 1013 (2009).**

10.   On January 21, 2010, Respondent moved to lift the stay imposed by Judge Howard.  On March 15, 2010, this Court -- to whom the matter had by then been transferred -- lifted the stay.

11.   Lee then sought a second stay, contending that he should be allowed to return to State court for yet another Rule 37 proceeding.  This request was denied, and Lee's attempts to obtain a writ of mandamus requiring such a stay from the Eighth Circuit Court of Appeals and the United States Supreme Court were unsuccessful.  The matter is now fully briefed and ripe for decision on the merits.

### STANDARD OF REVIEW

12.   Federal habeas corpus review of state law decisions is governed by **28 U.S.C. § 2254**, which provides that the federal courts "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." **§ 2254(a).**

The application cannot be granted unless the petitioner shows that he has exhausted the remedies available in the State courts,

-4-

or there is an absence of -- or only ineffective -- State process. **§ 2254(b).**

If the petitioner has exhausted his State remedies, *i.e.*, his claim was adjudicated on the merits by the State's highest court, his application can only be granted if the State court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." **§ 2254(d).**

State court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. **§ 2254(e)(1).**

13. Important corollaries to the foregoing statutory provisions have been developed in the case law, especially in **Coleman v. Thompson, 501 U.S. 722 (1991).** The Supreme Court, considering the implications of federal habeas corpus petitions on federalism, established the following:

* Federal courts will not review a question of federal law rejected by the State court if the State court's decision rests on a State law ground -- substantive or procedural -- that is independent of the federal question and adequate to support the decision. **501 U.S. at 729.**

* It follows that federal courts will not review a question of federal law rejected by the State court for failure to

follow State procedural rules, even though such a "procedural default" leaves the petitioner with no State remedies available to him. **501 U.S. at 730.**

\*   A procedural default may be excused if the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." **501 U.S. at 750.**

<u>**LEE'S CLAIMS**</u>

14.  **Lee's first claim is that he was denied his rights under the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution by the Arkansas Supreme Court's failure, on direct appeal of his murder conviction, to conduct mandatory review of the entire record for the possibility of reversible error.**

(a)  Lee alleges that during the period of time that his case was on direct appeal, the Arkansas Supreme Court's system of review was unconstitutionally arbitrary and capricious, shocked the conscience, and deprived the "sentencing scheme" of adequate safeguards "to ensure that each death sentence is an individualized decision by the sentencer."

(b)  Lee failed to present this claim to the State courts, so it is procedurally defaulted.  He has not shown cause for such default, nor that actual prejudice would result from the alleged violation of federal law, nor that failure to consider this claim

would result in a fundamental miscarriage of justice, so the default is not excused.

(c)  Even if this claim were not defaulted, it is without merit.  Lee relies on **State v. Robbins, 339 Ark. 379, 5 S.W.3d 51 (Ark. 1999),** for the proposition that automatic plenary review of the record is required in every case where the death penalty is meted out.  **Robbins** is not controlling, however.  It was decided wholly on the basis of Arkansas statutes and court rules, and thus does not provide a federal basis for Lee's claim.

In **Gregg v. Georgia, 428 U.S. 153, 206 (1976),** the Supreme Court praised an automatic plenary review system as "a check against the random or arbitrary imposition of the death penalty," but it did not hold that the Constitution required such review. Thus the current Arkansas requirement is more than what is constitutionally required.  States are, of course, "free to provide greater protections in their criminal justice system than the Federal Constitution requires." **California v. Ramos, 463 U.S. 992, 1013-14 (1983).**

(d)  Lee also contends that his due process rights were violated by "a state court's failure to follow its law." This argument is without merit because **Robbins** was decided after Lee's direct appeal was concluded, and is not retroactive.  **Robbins** held that

it will *henceforth* be the practice of this court to

> issue a writ of certiorari for the record in which the
> death penalty has been imposed and the defendant has
> waived his right to appeal.  We will then conduct a
> review of the record for prejudicial errors.

**339 Ark. at 387, 5 S.W.3d at 56** (emphasis added).

This language defeats Lee's "failure to follow the rules" due process claim, since automatic plenary review was not the law when Lee's direct appeal was decided.

(e)  Finally, the Court sees no merit to Lee's assertion that the review system in place at the time of his direct appeal was "the height of arbitrariness," and that "[i]t would be difficult to imagine a more arbitrary system of appellate review than what existed in Arkansas capital cases during the 1990s."

In disposing of Lee's direct appeal, the Arkansas Supreme Court said:

> The transcript of the record in this case has been
> reviewed in accordance with Arkansas Supreme Court Rule
> 4-3(h), which requires, in cases in which there is a
> sentence of life imprisonment or death, that we review
> all prejudicial errors in accordance with Ark. Code Ann.
> § 16-91-113(a)(1987).  None have been found.

**Lee I**, **327 Ark. at 706, 942 S.W.2d at 238.**

**Arkansas Supreme Court Rule 4-3(i)** (formerly subsection (h)) provides as follows:

> When the sentence is death or life imprisonment, the
> Court must review all errors prejudicial to the
> appellant in accordance with Ark. Code Ann. § 16-91-
> 113(a).  To make that review possible, the appellant
> must abstract, or include in the Addendum, as
> appropriate, all rulings adverse to him or her made by
> the circuit court on all objections, motions and
> requests made by either party, together with such parts

of the record as are needed for an understanding of each adverse ruling.  The Attorney General will make certain and certify that all of those objections have been abstracted, or included in the Addendum, and will brief all points argued by the appellant and any other points that appear to involve prejudicial error.

**A.C.A. § 16-91-113(a)** provides that "where either a sentence for life imprisonment or death has been imposed the Supreme Court shall review all errors prejudicial to the rights of the appellant."

As a result of these provisions, the Arkansas Supreme Court was apprised of every ruling adverse to Lee made in the Reese murder trial, whether prejudicial to Lee or not; had before it an abstract sufficient to evaluate the prejudice of those rulings; and was required to review them.  This is hardly the "height of arbitrariness" contended by Lee.

(f)  For all these reasons, the Court concludes that Lee's first claim for relief is without merit and it will be denied.

15.  **Lee's second claim is that the State's presentation of victim impact evidence violated his rights under the Fifth, Eighth, and Fourteenth Amendments; that the statute permitting the use of such evidence is unconstitutional under those amendments; and that the statute amounts to an unconstitutional *ex post facto* law.**

(a)  During the penalty phase of the Reese murder trial, Debra Reese's sister testified about the impact of the murder on

her family.  She testified to the following:

* that Debra lived very close to their parents and spent almost every day with her mother;

* that she and Debra were both trying to conceive a child, and their mother was making a quilt for the first one to get pregnant;

* that Debra had been the family event organizer, and would wear a Santa suit at Christmas and hand out gifts;

* that following the murder, Debra's parents began taking antidepressants and at the time of the trial her mother was still under psychiatric care;

* that  Debra's seven year-old son moved out of state to live with his father, and the family rarely saw the child after the murder.

The sister was pregnant at the time of her testimony, and testified that she intended to name the baby girl after Debra. She also related what it was like to have to purchase a wig for her sister's corpse to wear at the funeral.

(b)  Lee objected to this testimony on direct appeal, contending that the presentation of victim impact evidence at the trial violated due process and "improperly created a new aggravating circumstance." He asked that the Arkansas Supreme Court overturn its decisions in **Nooner v. State**, **322 Ark. 87, 907 S.W.2d 677 (Ark. 1995)** (holding the statute not void for vagueness

and not violative of the *ex post facto* clause) and **Kemp v. State**, **324 Ark. 178, 919 S.W.2d 943 (Ark. 1996)** (holding the statute not void for vagueness and not violative of the Eighth Amendment).

(c)   The Arkansas Supreme Court rejected Lee's challenge, holding that "the jury need not be instructed how to weigh any particular fact in the capital-sentencing decision, as a contrary rule would require a mandatory sentencing scheme," and that the victim impact evidence was not "so unduly prejudicial that it rendered Lee's trial fundamentally unfair."  **Lee I**, **327 Ark. at 703-04, 942 S.W.2d at 236.**

(d)   In **Payne v. Tennessee**, **501 U.S. 808 (1991)**, the Court held that:

> . . . if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

**501 U.S. at 827.**

In **California v. Ramos**, **463 U.S. 992, 1008 (1983)**, the Court recognized that

> [o]nce the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.

In **Tuilaepa v. California**, **512 U.S. 967, 979 (1994)**, the

Court said that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision."

(e)   The Arkansas Supreme Court's decision on this issue was neither contrary to nor an unreasonable application of **Payne**, **Ramos** and **Tuilaepa**.   The Supreme Court, in reaching its decision in **Payne**, rejected former case law preventing introduction of victim impact evidence as a "misreading of precedent" which "unfairly weighted the scales in a capital trial":

> [W]hile virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering "a quick glimpse of the life" which a defendant "chose to extinguish," or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide.

**501 U.S. at 822.**

The victim impact evidence introduced in Lee's case was nothing more than a quick glimpse of Debra Reese's life and a demonstration of the loss to her family resulting from her murder. It was similar in quality and quantity to the evidence approved in **Payne**, where a grandmother testified about the effect of the murder of her daughter and granddaughter on her three-year-old grandson, who was present and grievously injured during the crime, as follows:

> "He cries for his mom.  He doesn't seem to understand why she doesn't come home.  And he cries for his sister Lacie.  He comes to me many times during the week and asks me, Grandmama, do you miss my Lacie.  And I tell him yes.  He says, I'm worried about my Lacie."

**501 U.S. at 814.**

(f)  In addition to Supreme Court precedent allowing victim impact evidence, the Court finds that the jury instructions in Lee's case deprive this claim of all force.  The jury was instructed as follows:

> Evidence that people have been impacted by the death of Debra Reese, if you so find from the evidence, is not an aggravating circumstance and shall not be considered by you in determining whether an aggravating circumstance existed.

This instruction made clear to the jury that the victim impact evidence did not create a new aggravating circumstance, and thus did not become a substantive factor involved in the weighing procedure mandated under Arkansas law.

(g)  Lee's *ex post facto* argument is procedurally defaulted, because he did not assert it on direct appeal and he has shown nothing that would excuse that default.  Even if it were viable, however, it would be meritless.

As explained in **Dobbert v. Florida**, **432 U.S. 282 (1977)**,

> . . . any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*.

**432 U.S. at 292,** quoting **Beazell v. Ohio**, **269 U.S. 167, 169-70 (1925).**

In **Dobbert** the Court declined to find an *ex post facto*

violation where the law in question "simply altered the methods employed in determining whether the death penalty was to be imposed," without changing the "quantum of punishment attached to the crime." *Id.* **at 293-94.** The Arkansas victim impact law, like the law at issue in **Dobbert**, made no change in the quantum of punishment for the crime of capital murder, which was already established when Lee murdered Reese, nor did it deprive Lee of any defense then available to the charge.

(h) For all these reasons, Lee's second claim for habeas relief is without merit, and will be denied.

16. **Lee's third claim is that he was convicted and sentenced to death under a statutory scheme that is unconstitutionally vague, in violation of the Fifth, Eighth, and Fourteenth Amendments.**

(a) The thrust of this claim is Lee's contention that the elements of **A.C.A. § 5-10-101(a)(4)** (causing death with premeditated and deliberated purpose) and those of **A.C.A. § 5-10-102** (causing death with the purpose of causing death) are "virtually indistinguishable," allowing "freakish arbitrariness" in deciding guilt and meting out punishment.

(b) Lee raised this claim on direct appeal, and the Arkansas Supreme Court rejected it, stating simply that it had "decided this issue adversely to Lee's position on many occasions, and adhere[d] to these previous holdings." **Lee I, 327 Ark. at 702,**

**942 S.W.2d at 236.** The decision cited **Echols v. State**, **326 Ark. 917, 936 S.W.2d 509 (Ark. 1996)** and **Nooner v. State**, **322 Ark. 87, 907 S.W.2d 677 (Ark. 1995).**

Neither **Echols** nor **Nooner** includes an analysis of the reasoning behind the Arkansas Supreme Court's rejection of the argument. In **Sanders v. State**, **317 Ark. 328, 344, 878 S.W.2d 391, 400 (Ark. 1994),** however, the Arkansas Supreme Court stated that it is "a well-worn argument we have rejected on numerous occasions, holding that the statutes are not constitutionally infirm because there is no impermissible uncertainty in the definitions of the capital-murder offenses."

(c) In **Gregg v. Georgia**, **428 U.S. 153 (1976),** the Court noted the holding in **Furman v. Georgia**, **408 U.S. 238 (1972),** that

> where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

**428 U.S. at 189.**

In **Gregg** the Court recognized that even "somewhat general" standards developed to "guide a capital jury's sentencing deliberations" will "reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary."

Moreover,

> [w]here the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is

available to ensure that death sentences are not imposed
capriciously or in a freakish manner.

**428 U.S. at 193-95.**

In **Godfrey v. Georgia**, **446 U.S. 420 (1980)**, the Court said
that

> if a State wishes to authorize capital punishment it has
> a constitutional responsibility to tailor and apply its
> law in a manner that avoids the arbitrary and capricious
> infliction of the death penalty.  Part of a State's
> responsibility in this regard is to define the crimes
> for which death may be the sentence in a way that
> obviates "standardless [sentencing] discretion."

**446 U.S. at 428.**

(d)   The Arkansas Supreme Court's reasoning on this issue was
not contrary to, nor did it involve an unreasonable application
of, the law established in **Godfrey** and **Gregg**.

The difference between the two statutes defining the offenses
is the difference between *purpose*, and *premeditated and
deliberated purpose*.  While these are similar concepts, they are
not identical, and the difference between them was explained to
the jury in the Reese murder trial by instruction.

During the guilt phase of Lee's trial, the jury was
instructed that, to convict Lee of the charge of capital murder,
the State had to prove, beyond a reasonable doubt, "that with the
premeditated and deliberated purpose of causing the death of any
person Ledell Lee caused the death of Debra Reese."

The trial court then instructed the jury that

-16-

[i]n order to find that Ledell Lee acted with premeditated and deliberated purpose, you must find that he had the conscious object to cause the death and that he formed that intention before acting, as a result of a weighing in the mind the consequences of a course of conduct as distinguished from acting upon sudden impulse without the exercise of reasoning powers. It is not necessary that this state of mind existed for any particular length of time. But it is necessary that it was formed before the homicidal act was committed.

The jury was further instructed that Lee was also charged with the lesser offense of first degree murder, which required the State to prove beyond a reasonable doubt that "with the purpose of causing the death of Debra Reese Ledell Lee caused the death of Debra Reese."

The trial court instructed the jury that

[a] person acts with purpose with respect to his conduct or a result thereof when it is his conscious object to engage in conduct of that nature or to cause such a result.

These instructions were suitably tailored so as to minimize the risk of arbitrary and capricious action.

During the penalty phase of Lee's trial, instructions required the jury to decide which, if any, of the statutory aggravating circumstances existed beyond a reasonable doubt. They required the jury to decide what mitigating circumstances existed, with the option of choosing listed items and/or adding other mitigating circumstances they found, both unanimously and less than unanimously.

Finally, the jury was instructed as follows:

-17-

> In no event will you return a verdict imposing the death penalty unless you unanimously make three particular written findings on form 3.  These are:
> First, that one or more aggravating circumstances existed beyond a reasonable doubt;
> Second, that such aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances found to exist; and
> Third, that the aggravating circumstances justify beyond a reasonable doubt the sentence of death.

(e)   The specificity of these instructions does not equate to standardless discretion, nor will they admit of arbitrary or capricious imposition of the death penalty.  This claim for relief is without merit, and will be denied.

17.  **Lee's fourth claim is that the State's use of voter registration records to select the jury panel violated his Fifth, Sixth, and Fourteenth Amendment rights to a jury comprised of a fair cross-section of the community.**

(a)   Lee argues that the use of voter registration records to select the jury pool systematically under-represented blacks, women, and other constitutionally cognizable groups that have historically been the target of systematic exclusion from service on juries.  Lee, who is black, focuses his arguments on the very small percentage of black veniremen on his panel and on his jury.

(b)   Lee raised this claim on direct appeal, and the Arkansas Supreme Court rejected it, finding that Lee had failed to meet the test enunciated in **Duren v. Missouri**, **439 U.S. 357, 364 (1979)**. Most tellingly, it found that Lee had failed to meet the third

factor in the **Duren** test because he

> acknowledges in his brief our previous holdings that,
> where the venire is chosen by computer, using the
> random-selection process maintained by Ark. Code Ann. §
> 16-32-103 (Repl. 1994), there is no possibility of a
> purposeful exclusion of African-Americans.

**Lee I, 327 Ark. at 699, 942 S.W.2d at 234.**

(c)   In **Duren**, the Supreme Court ruled that to establish a

prima facie case of deliberate or systematic exclusion of a group

from jury service, a defendant must prove:

> (1) that the group alleged to be excluded is a
> "distinctive" group in the community; (2) that the
> representation of this group in venires from which the
> juries are selected is not fair and reasonable in
> relation to the number of such persons in the community;
> and (3) that this under-representation is due to
> systematic exclusion of the group in the jury-selection
> process.

**439 U.S. at 364.**

(d)   The Arkansas Supreme Court did not decide this issue in

a manner contrary to clearly established Federal law, nor did it

base its decision on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding.

The Arkansas statute in question, **A.C.A. § 16-32-103**,

requires the circuit judge to pick a number from one to one

hundred.  The circuit clerk then selects the name corresponding to

that number on the list of registered voters of the applicable

district or county.  Counting up by hundreds, the clerk selects

the voters in that numerical position on the entire voter

registration list.[1]  The process is repeated with a new number if necessary to obtain sufficient prospective jurors for the coming year.

The randomness of this process is apparent, and it cannot be construed as "systematic exclusion" of any group, unless one accepts Lee's contention that the very use of voter registration records as the basis for selection amounts to "systematic exclusion."  To do so would require a showing that a particular group was known by the State to be under-represented in the voter registration list, that such under-representation was caused by the State, and that the State determined to rely on voter registration records for jury selection because of such under-representation.  Lee has not made such a showing, nor could he do so.[2]  "The mere fact that one identifiable group of individuals votes in a lower proportion than the rest of the population does not make a jury selection system illegal or unconstitutional."  **U.S. v. Clifford**, **640 F.2d 150, 156 (8th Cir. 1981).**

(e)  Because Lee has failed to demonstrate that the Arkansas Supreme Court decided this claim contrary to federal law, or on an unreasonable determination of facts, it is without merit and

---

[1] The statute gives an example: "if the starting number is sixty-seven (67), which is the first selection, the second selection would be the one hundred sixty-seventh registered voter, the third selection would be the two hundred sixty-seventh registered voter, and so forth until the current registered voter list is exhausted."  **§ 16-32-103(2).**

[2] Lee asserts in his Petition, and the trial transcript supports, that Pulaski County voter registration records do not reflect the race of those registered to vote.

will be denied.

18.  **Lee's fifth claim is that he was denied due process and a fair trial by the State's bad faith destruction of physical evidence.**

(a)  This argument arises from the fact that two small spots of blood found on the shoes Lee was wearing when he was arrested after the Reese murder were "consumed" during testing at the Arkansas State Crime Lab to determine if they were human blood. There was nothing left of the spots that Lee could have tested to determine if the DNA of the spots matched Reese's DNA.

(b)  Lee raised this argument on direct appeal, and the Arkansas Supreme Court rejected it, stating that for a constitutional violation to be predicated on this type of situation, three things must be shown:

*    that the evidence had an exculpatory value that was apparent before it was destroyed;

*    that the evidence was of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable means; and

*    that the police acted in bad faith by failing to preserve potentially useful evidence.

**Lee I**, 327 Ark. at 700, 942 S.W2d at 235.

The Arkansas Supreme Court found that Lee failed to show that the blood on the shoes possessed any exculpatory value before it

-21-

was destroyed, or that the State had acted in bad faith by failing to preserve the blood, as it had been consumed during normal testing procedures.

(c)  In **Arizona v. Youngblood**, **488 U.S. 51 (1988)**, the Supreme Court contrasted the duty to disclose exculpatory evidence under **Brady v. Maryland**, **373 U.S. 83 (1963)** -- where good faith is irrelevant -- with "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subject to tests, the results of which might have exonerated the defendant" -- where a showing of bad faith is necessary to establish a due process violation.  **488 U.S. at 57-58.**

The Court reiterated the distinction between "material exculpatory evidence" and "potentially useful evidence" in **Illinois v. Fisher**, **540 U.S. 544, 549 (2004),** noting that bad faith must be shown to establish a constitutional violation for the destruction of potentially useful evidence.

(d)  Lee contends that bad faith can be inferred from:

*    the potential value of the blood evidence;

*    the fact that he had counsel when the blood was tested, but they were not notified of the testing;

*    the fact that the testing could have been done in a non-destructive manner; and

*    the fact that the State did not preserve the blood

-22-

evidence by photographic means.

(e) Lee's argument founders on the first of these assertions. The blood evidence did not have potential exculpatory value. Unlike the semen evidence in **Youngblood**, which was found on the victim and thus would have established whether the defendant was the perpetrator of the crime, the blood here was on Lee's own shoes, and could have been Lee's blood, either from a cut sustained during the murder or from some earlier mishap. Only if the blood had been Reese's blood would it have had evidentiary value, and the value would have been inculpatory. Even if the blood on Lee's shoes was not Reese's blood, it would not have exonerated Lee.

(f) For the foregoing reasons, Lee has failed to show that the Arkansas Supreme Court's disposition of this issue was contrary to federal law, or was based on an unreasonable determination of the facts. This claim for relief is without merit, and will be denied.

19. **Lee's sixth claim is that he was denied due process and his rights under the Fifth, Eighth, and Fourteenth Amendments by the State court's denial of his motion to sever the crimes relied upon by the State as aggravating circumstances in the penalty phase of the Reese murder trial.**

(a) During the penalty phase of the Reese murder trial, the State presented evidence of three rapes as aggravating

-23-

circumstances.  While all three rape victims testified, the State relied primarily on proof that Lee had been convicted of one of the rapes, and on DNA analysis showing an extremely high probability that Lee had committed the other two.

Lee contends that the trial court's refusal to sever these crimes and require the State to try them separately before using them as aggravating circumstances was fundamentally unfair (and thus a violation of due process), because he would have been entitled to a severance if he had been charged in one indictment with all three rapes, and the presentation of all three rape cases "undoubtedly" predisposed the jury to find guilt based on the "sheer number" of allegations rather than the evidence.

(b)  These arguments were asserted on direct appeal, where the "failure to sever" claim was rejected because the severance provisions of the Arkansas Rules of Criminal Procedure were not applicable, given that Lee was not charged with the rapes in the Reese murder trial.  The failure to sever claim is not one cognizable under **§ 2254**, because it does not involve an alleged violation of federal law.

The Arkansas Supreme Court refused to consider Lee's due process claim because he failed to support it with any citation to facts or authorities.  **Lee I**, **327 Ark. at 705, 942 S.W.2d at 237.** Under these circumstances, the due process claim is procedurally defaulted, and Lee has shown no basis to excuse the default.

(c) Even if the due process claim were not procedurally defaulted, Lee has also failed to support it with any citation to facts or authorities before this Court, and an examination of the statute in question indicates that it is not fundamentally unfair.

One aggravating circumstance in the Arkansas capital murder sentencing scheme, set out at **A.C.A. § 5-4-604(3)**, is that the defendant "previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person."

The Arkansas Supreme Court has held that the reason for this provision is "to allow the state to show that the defendant has a character for violent crimes or a history of such crimes." **Hill v. State**, 289 Ark. 387, 395, 713 S.W.2d 233, 237 (Ark. 1986). "Character" and "history" are concepts broad enough to include repeated conduct.  While Lee insists that such evidence would "undoubtedly" predispose the jury to find guilt, this proposition is not self-evident and Lee offers no federal precedent that would be contravened by the admission of such evidence.  Indeed, the Court considers it more likely that reliance on such aggravating circumstances would promote fairness, acting as a "guide" to the "capital jury's sentencing deliberations," as called for in **Gregg, supra**, and reducing the likelihood of "standardless discretion" faulted in **Godfrey, supra**.

-25-

Nor does Lee persuade the Court that there is any unfairness in allowing an aggravating factor felony to be proven by evidence other than a conviction.   When relying on evidence other than proof of a conviction, the weighing process is restricted to aggravating circumstances found to exist beyond a reasonable doubt -- which is the burden of proof in criminal cases. **A.C.A. § 5-4-603(a)(1).**

(d)   For the foregoing reasons, Lee has failed to show that his constitutional rights were violated by use of the three rapes as aggravating circumstances.   This claim for relief is without merit, and will be denied.

20.   **Lee's seventh claim is that he was denied due process and a fair trial by the trial judge's refusal to recuse based on his relationship with a prosecuting attorney and the State's failure to disclose this relationship to defense counsel.**

(a)   The background of this claim is as follows.   The Reese murder trial was prosecuted by Holly Lodge of the Sixth Judicial District Prosecuting Attorney's Office ("Prosecutor's Office"), and tried by Pulaski County Circuit Judge Chris Piazza.   At some point in time, Judge Piazza became romantically involved with Melody Larue, who at the time of the Reese murder trial was a deputy prosecuting attorney in the Prosecutor's Office. The existence of the relationship is not disputed -- Judge Piazza and Larue eventually married -- but the date when it commenced, and

whether it had any impact on the trial, are disputed.

Lee contends that Judge Piazza and Larue were romantically involved at the time of the Reese murder trial, and that this involvement caused Judge Piazza to be biased in favor of the prosecution.

(b)  Lee failed to raise this claim on direct appeal, but it was raised in both Rule 37 Petitions.  At the conclusion of the hearing on the First Rule 37 Petition, Judge Langston found Lee had failed to prove either the existence of a romantic relationship at the time of the Reese murder trial, or any prejudice that might have flowed from it.

On appeal, the Arkansas Supreme Court rejected the claim, stating that it should have been raised on direct appeal, and deferring to Judge Langston's factual finding that Lee had failed to prove the existence of the alleged relationship.  **Lee II, 343 Ark. at 725, 38 S.W.3d at 349.**

Lee raised the issue again in the Second Rule 37 Petition. At the conclusion of the hearing on this Petition, Judge Langston again found that Lee had failed to prove the existence of a relationship between Judge Piazza and Larue that would have required disclosure to the parties or that warranted recusal.

The issue was not pursued on appeal of the Second Rule 37 Petition.  Lee's attorney wrote in his brief that Lee wanted to appeal the circuit judge's findings on this issue but that he, the

attorney, had determined the issue "is not one that should be pursued." While the attorney suggested in the brief that he would petition to withdraw so new counsel could be appointed and brief the issue, that did not occur. As a result, the issue was not argued on appeal, and the Arkansas Supreme Court declined to address it. **Lee III**, **2009 Ark. at 5, 308 S.W.3d at 601-02.**

(c) The Court first considers whether this issue is procedurally defaulted by Lee's failure to raise it on direct appeal, or whether such default can be excused under the "cause and prejudice" standard.

Lee's trial attorneys testified in the hearing on the First Rule 37 Petition that they had no idea, during the trial, that there might have been any romantic relationship between Judge Piazza and Larue, and it is highly unlikely that Lee himself would have had such knowledge if his attorneys did not. Cause to excuse procedural default is established where the constitutional issue in question was "reasonably unknown" to petitioner at the relevant time. **Amadeo v. Zant**, **486 U.S. 214, 222 (1988).** The Court turns, then, to the issue of whether actual prejudice -- the necessary complement to cause -- has been shown.

(d) Lee's argument is that the alleged romantic relationship was going on during the Reese murder trial; that it created bias on the part of Judge Piazza; and that such bias amounts to structural error which so infected the trial that prejudice is

presumed.  He bases this reasoning on **Tumey v. Ohio**, **273 U.S. 510 (1927)** and **Johnson v. U.S.**, **520 U.S. 461 (1997)**, the first holding and the second reiterating that trial before a biased judge constitutes structural error, *i.e.*, "a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself" (citing **Arizona v. Fulminante**, **499 U.S. 279 (1991)**.  In **Chapman v. California**, **386 U.S. 18, 23, fn 8 (1967)**, the Supreme Court recognized that trial before a biased judge can never be treated as harmless error.

(e)  The flaw in Lee's argument is that not every romantic relationship between a judge and an attorney with some connection to a case, no matter how distant, can be presumed to generate bias constituting structural error.  This is true even if the relationship amounts to a violation of ethical standards (an issue as to which this Court expresses no opinion).

In **Bracy v. Gramley**, **520 U.S. 899 (1997)**, the Supreme Court made it clear that there is a difference between "common law, statute, or the professional standards of the bench and bar" that require judicial disqualification, and the constitutional due process requirement of a "'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." **520 U.S. at 904-05** (internal citation omitted).  In **Caperton v. A.T. Massey Coal Co., Inc.**, **556 U.S. 868, 890 (2009)**, the Supreme Court specifically recognized

-29-

that "codes of judicial conduct provide more protection than due process requires."

Common law, statutory, and professional standards concern themselves with the broad spectrum of potential sources of judicial bias, from the appearance of bias that can exist even when the judge is unaware of facts supporting it, **Liljeberg v. Health Services Acquisition Corp.**, **486 U.S. 847 (1988)**, through presumed bias arising from degree of consanguinity, to personal knowledge of disputed evidentiary facts, to actual bias. **28 U.S.C. § 455.**

The constitutional standard is limited to a much narrower range of conduct, examples of which are fortunately few. **Bracy** involved a judge who had been convicted of taking bribes to "fix" cases. **Tumey** involved a judge who had a financial interest in the outcome of the case. **In re Murchison**, **349 U.S. 133 (1955)**, involved a trial where the judge had acted as a one-man "judge-grand jury," hearing evidence and deciding to prosecute the defendant, then trying and convicting him. **Commonwealth Coatings Corp. v. Continental Casualty Co.**, **393 U.S. 145 (1968)**, involved an arbitration where the arbitrator, unknown to one of the parties, had ongoing business dealings with the other party.

In **Caperton** the Court articulated an objective standard for evaluating alleged bias that would violate the Due Process Clause:

. . . the Due Process Clause has been implemented by

objective standards that do not require proof of actual
bias.  In defining these standards the Court has asked
whether, under a realistic appraisal of psychological
tendencies and human weakness, the interest poses such
a risk of actual bias or prejudgment that the practice
must be forbidden if the guarantee of due process is to
be adequately implemented.

**556 U.S. at 883-84** (internal citations and quotation marks omitted).

While noting that "[n]ot every campaign contribution by a litigant or attorney creates a probability of bias that requires a judge's recusal, the Court found that a risk of actual bias existed where one party had donated millions of dollars to the election campaign of an appellate judge who ruled in its favor (not once but twice) in 3-2 decisions.

(f)  When the Court applies the **Caperton** standard to the allegations here, it does not believe that, under a realistic appraisal of psychological tendencies and human weakness, the interest that would exist if Judge Piazza were romantically involved with Larue during the Reese murder trial would have posed such a risk of actual bias as to violate Lee's due process rights. Larue was not prosecuting the case, nor was she the elected Prosecuting Attorney, who might have had a professional or political interest in its outcome.

Lee's cited cases involving judges romantically involved with attorneys are inapposite.  All three -- **In re Chrzanowski**, **465 Mich. 468, 636 N.W.2d 758 (Mich. 2001), In re Gerard**, **631 N.W.2d**

**271 (Iowa, 2001),** and **U.S. v. Berman**, 28 M.J. 615 (1989) -- deal with judges who presided over cases in which a party was represented by an attorney with whom the judge was romantically involved.

For these reasons, the Court finds that Lee has failed to show actual prejudice sufficient to excuse his procedural default of this issue.

(g)  Even if the issue were not procedurally defaulted, it would be without merit.  Following the hearings on both Rule 37 Petitions, Judge Langston found that Lee had failed to prove the existence of a relationship between Judge Piazza and Larue that warranted either disclosure or recusal.  Under **§ 2254(e)(1),** these findings of fact are presumed to be correct, and Lee has the burden of rebutting them by clear and convincing evidence, which he has not done.

Lee has offered his own view of the evidence on this subject, which is that Pat Piazza (who was Judge Piazza's wife at the time of the Reese murder trial and whose testimony tended to prove that a romantic relationship between Judge Piazza and Larue existed at that time) was more credible than Judge Piazza because she had nothing to gain by lying.  While this is a permissible view of the evidence, the Supreme Court has "frequently . . . emphasized that '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous'."

**Amadeo**, *supra*, **486 U.S. at 214.**

(h)  For all the foregoing reasons, this claim for relief is without merit and will be denied.

21.  **Lee's eighth claim is that the cumulative effect of errors committed in his State court proceedings entitle him to habeas relief.**

The Eighth Circuit Court of Appeals has rejected the notion of cumulative error as a basis for habeas relief, pointing out that the aggregation of errors which do not individually amount to constitutional or statutory violations cannot collectively reach that level.  **Middleton v. Roper**, **455 F.3d 838, 851 (8th Cir. 2006)**.  This precedent is binding on this Court.  This asserted basis for habeas relief is, therefore, without merit.

22.  **Lee's ninth claim is that he was convicted and sentenced to death in violation of his Sixth and Fourteenth Amendment rights to representation by conflict-free counsel.**

(a)  The background of this issue is as follows.  At the same time Lee was facing trial for the Reese murder, he was facing trial on another murder charge and three rape charges.  The same attorneys (Bill Simpson and Bret Qualls) represented Lee in all five cases, but there were three different judges involved.  Lee, acting *pro se*, represented to Judge Marion Humphrey, who was hearing the rape cases, that he had a conflict with Simpson and Qualls.  Although Simpson and Qualls denied that a conflict

-33-

existed, Judge Humphrey relieved them and appointed Dale Adams to represent Lee in the rape cases.

Judge Humphrey did not articulate what conflict he found. The Arkansas Supreme Court was unable to determine what conflict Judge Humphrey found. **Lee II, 343 Ark. at 714, n. 2, 38 S.W.3d at 342, n. 2.** This Court, after reviewing the record, finds nothing more than dissatisfaction on Lee's part with how his attorneys were handling his cases and how frequently they communicated with him.

After Judge Humphrey ruled that a conflict existed, Lee moved to have Simpson and Qualls relieved in the Reese murder case, contending that they would not do some of the things he wanted them to do in his defense; that Simpson told him he "should have got the death penalty" after the first Reese murder trial; and that if they had a conflict in the rape cases they necessarily had one in the murder cases.

While Simpson and Qualls had initially taken the position that no conflict existed, when Lee refused to communicate with them after Judge Humphrey's ruling they eventually came to the conclusion that there was a conflict, and tried repeatedly to be relieved. Simpson testified in connection with the First Rule 37 Petition that the situation put him and Qualls "in an awkward position." After Lee filed a federal lawsuit against Simpson, Simpson took the position that there was an actual conflict of

interest.

Judge Piazza considered Lee's request that Simpson and Qualls be relieved and replaced (and the corresponding requests of Simpson and Qualls) over the course of five hearings between February 22, 1995, and May 15, 1995, and found no basis to relieve Simpson and Qualls. The statements made by Lee, Simpson, and Qualls in these hearings revealed that after Judge Humphrey relieved Simpson and Qualls in the rape cases, Lee simply refused to discuss the Reese murder case with them. This refusal put Simpson and Qualls in a difficult position, but Judge Piazza considered it a problem created by Lee, not an actual conflict of interest.

While Judge Piazza found no conflict and refused to replace Simpson and Qualls, he eventually (at the May 15, 1995, hearing) appointed Adams to represent Lee in the penalty phase of the Reese murder trial and granted a continuance to allow Adams to prepare. At that hearing, Lee waived any conflict in his continued representation by Simpson and Qualls at the guilt phase of the Reese murder case.

On the first day of the Reese murder trial -- October 9, 1995 -- Lee again attempted to assert a conflict with Simpson. Judge Piazza refused to relieve Simpson, and the trial proceeded.

(b) Lee raised the issue of attorney conflict in both Rule 37 Petitions. Judge Langston, who heard both petitions, ruled

against Lee on this issue.

Following the hearing on the First Rule 37 Petition, Judge Langston found:

* that there was no evidence of an actual conflict;

* that there was no indication of why Judge Humphrey found a conflict;

* that Lee had waived any possible conflict before Judge Piazza; and

* that the lawsuit against Simpson was not filed until after the Reese murder trial was over.

On appeal of the First Rule 37 Petition, the Arkansas Supreme Court held that Lee had "clearly waived any conflict of interest that might have existed" and failed to raise the issue on direct appeal. **Lee II, 343 Ark. at 713-14, 38 S.W.3d at 341-2.**   It refused to consider Lee's arguments on the issue.

After the Second Rule 37 hearing, Judge Langston found that Lee had shown no way in which his attorneys' performance had been adversely affected by any actual conflict, and that Lee had knowingly, intelligently, and voluntarily waived any conflict.

On appeal the Arkansas Supreme Court held that Lee "has not shown a conflict of interest that actually affected his attorney's performance," or that "any conflict between his attorneys and him had an actual, demonstrable, detrimental effect on their representation of him." **Lee III, 2009 Ark. at 8-10, 308 S.W.3d at**

**603-04.**  It declined to reach Lee's challenge to the waiver of conflict because Lee had made no showing that "the conflict of interest he raises had anything but an 'abstract or theoretical' effect on his defense."  *Id.*

(c)  The United States Supreme Court has dealt with attorney conflicts issues primarily in situations involving divided loyalties, chiefly those arising where one attorney represents multiple defendants.  *See, e.g.*, **Wheat v. U.S.**, **486 U.S. 153, 163 (1988)**; **Cuyler v. Sullivan**, **446 U.S. 335 (1980)**; and **Holloway v. Arkansas**, **435 U.S. 475 (1978)**.

Another situation where divided loyalties might occur was explored in **Wood v. Georgia**, **450 U.S. 261 (1981)**, where defendants were represented by an attorney paid by their employer, who might have been seeking to establish a legal precedent in its favor in spite of the detriment that portended for its employees, the defendants.

The Court considered a claim more akin to Lee's in **Morris v. Slappy**, **461 U.S. 1 (1983)**.  The defendant there was dissatisfied with an attorney appointed to represent him shortly before trial when his original attorney fell ill.  The defendant failed to show that the new attorney was unprepared, and the Court rejected the notion that a criminal defendant was constitutionally entitled to a meaningful relationship with his attorney.

(d)  The Arkansas Supreme Court's decision on this issue did

not run contrary to any of these precedents, nor did the Arkansas courts make an unreasonable determination that Lee had waived any conflict.   To the extent there was any conflict between Lee and his attorneys, it was conflict in the sense of "strife," not conflict in the sense of divided loyalties, and the waiver issue was carefully and fully explored on the record by Judge Piazza.

**U.S. v. Barrow**, 287 F.3d 733 (8th Cir. 2002), is instructive here.   The court in **Barrow** said that "[a]ppointment of new counsel is warranted only when the defendant demonstrates justifiable dissatisfaction with his appointed attorney":

> When faced with a motion to appoint substitute counsel, the district court must balance several factors, including "the need to ensure effective legal representation, the need to thwart abusive delay tactics, and the reality that a person accused of crime is often genuinely unhappy with an appointed counsel who is nonetheless doing a good job."  The court must conduct an adequate inquiry into the nature and extent of an alleged breakdown in attorney-client communications.   The focus of the justifiable dissatisfaction inquiry is the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney.
>
> \*      \*      \*
>
> Justifiable dissatisfaction includes an irreconcilable conflict or a complete breakdown in communication.   But it does not include a defendant's frustration with counsel who does not share defendant's tactical opinions but continues to provide zealous representation.   Thus, a defendant has no right to an attorney who will docilely do as she is told, or to a "meaningful relationship" with appointed counsel.

287 F.3d at 737-38 (internal citations omitted).

The court in **Barrow** found "no total breakdown in communication, only an unwillingness on Barrow's part to

communicate with counsel."  *Id.*

(e)  Lee makes several arguments in support of his contention that he was justifiably dissatisfied with his attorneys, none of which have merit.

*    He contends that there was the potential for "inconsistent strategies," relating to the fact that the State planned to use the three rape cases as aggravating circumstances in the Reese murder trial, yet the rape cases were being tried by Adams and the murder case by Simpson and Qualls.  The argument is that Simpson and Qualls might, in defending the rape cases in the penalty phase of the murder case, act inconsistently with Adams' plan to defend them at the trials of those charges.

This argument is without merit for two reasons.  First, there is no reason to expect that Simpson and Qualls could not coordinate their defense presentations with that of Adams.  The attorneys were not at odds with each other, and there is no showing that Simpson and Qualls suffered from divided loyalties.

Second, Judge Piazza eventually appointed Adams to represent Lee in the penalty phase of the murder case, which is the phase when the rape cases would be presented.

*    Lee contends that an actual conflict was created when he sued Simpson.  The transcript of the Reese murder trial indicates that Lee gave Qualls an unfiled copy of a lawsuit against Simpson and the Public Defender's Office on April 18, 1995, and that

Simpson contended that this lawsuit "puts us in an adversarial position with the defendant."  While the Court can understand Simpson taking this position, Judge Piazza rejected the argument, stating that the document was "simply a Rule 37 disguised as a lawsuit against the public defender's office."

It was not error to reject this attempt to disqualify Simpson and Qualls.  Defendants cannot be allowed to manufacture grounds for disqualification of their attorneys, **Winfield v. Roper, 460 F.3d 1026, 1040 (8th Cir. 2006),** and in the absence of any showing of an actual conflict, there is no basis to find error in Judge Piazza's decision on this issue.[3]

\*      Lee contends that he could not, or did not, effectively waive any conflict with Simpson and Qualls.  His contention that such conflict was not waivable is unsupported by Supreme Court precedent.  Even actual conflict is waivable, although courts are admonished to "indulge every reasonable presumption against the waiver of fundamental rights." **Glasser v. U.S., 315 U.S. 60, 70 (1942), superseded by statute on other grounds.**  *See*, *e.g.*, **Wheat v. U.S.,** *supra*, **486 U.S. at 163** ("district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be

---

[3] The transcript of the First Rule 37 Proceeding contains a copy of a federal lawsuit file-marked November 13, 1995, brought by Lee against Simpson, Judge Piazza, Judge Plegge (who was handling the other murder case against Lee), and Holly Lodge, the Prosecuting Attorney.  This lawsuit was not filed until after the second Reese murder trial was concluded, and could not, therefore, have created any conflict at that trial.

demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses").

* Lee contends that any waiver applied only to Adams and not to Simpson. This contention is belied by the record. At the hearing in which the waiver occurred, Judge Piazza said to Lee that it was his "understanding that Mr. Adams and Mr. Simpson have conferred with you about this situation, and it is my understanding that you intend to waive any conflict of interest and accept the situation as it exists. Is that correct?" Lee answered "[y]es, it is."

Just to be sure, the prosecuting attorney asked Lee whether he was "perfectly satisfied with Mr. Simpson defending you in the guilt phase of this trial," and Lee answered "[y]es, I am."

* Lee contends that Simpson told him, after the first Reese murder trial ended in a hung jury, that he should have gotten the death penalty, and would get it the next time. Lee contends this meant Simpson would not fight for him. However, in an Amended Petition filed by Lee in Case No. LR-C-95-718 in the United States District Court for the Eastern District of Arkansas, Lee's description of this exchange between himself and Simpson suggests that Simpson was urging Lee to negotiate a plea in the Reese murder case because of the likelihood that he would be convicted and sentenced to death upon retrial. Good legal advice

may be couched in harsh terms, but that does not necessarily create "a conflict."

(f) Because there is no basis to find that the Arkansas courts made an unreasonable determination of the facts related to this issue, or decided it in a manner contrary to established Federal law, this claim for relief is without merit, and will be denied.

23. **Lee's tenth claim is that he was denied effective assistance of counsel at trial and at sentencing in violation of his rights under the Sixth and Fourteenth Amendments.**

This claim asserts that Lee was denied his right to effective assistance of counsel by the following alleged failures on the part of his attorneys:

(a) failing to present testimony by numerous witnesses who had valuable testimony to offer on his behalf;

(b) failing to "highlight" the absence of blood on his clothing;

(c) failing to present evidence to rebut the three rapes used as aggravators;

(d) failing to prove that the State had offered him life without parole in exchange for a guilty plea;

(e) failing to seek remedial measures to counteract pretrial publicity;

(f) failing to object to prejudicial testimony about crack

cocaine use;

(g)   failing to seek a mistrial when a juror entered chambers during deliberations;

(h)   failing to support a motion to prohibit use of voter registration records to select the jury panel;

(i)   failing to investigate Judge Piazza's personal relationship with an attorney in the prosecutor's office;

(j)   failing to object to improper closing argument by the prosecutor;

(k)   failing to make the correct argument against use of victim impact evidence;

(l)   failing to raise and preserve a claim that the time condemned inmates spend on death row is cruel and unusual punishment; and

(m)   failing to argue cumulative error at trial.

24.   The law regarding claims of ineffective assistance of counsel stems from **Strickland v. Washington, 466 U.S. 668 (1984),** where the Court enunciated a two-part test for evaluating such claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or

death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

**466 U.S. at 687.**

Counsel's performance is deficient if it falls below an objective standard of reasonableness under prevailing professional norms, considering all the circumstances, viewed as of the time the conduct took place.  *Id.* **at 688, 690.**

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* **at 689** (internal citation and quotation marks omitted).

Counsel's deficient performance prejudiced the defense if the defendant can show

> a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* **at 694.**

In a federal habeas proceeding, there is yet another hurdle for defendant to clear.  In order to prevail on an ineffective assistance of counsel claim at this stage, the petitioner must do

more than satisfy the **Strickland** standard as it might be interpreted by this Court *ab initio*.  He must show that the State court applied **Strickland** in an objectively unreasonable manner.  **Bell v. Cone**, 535 U.S. 685, 698-99 (2002).

With these principles in mind, the Court turns to the specific errors alleged by Lee.

25.  **Lee's first ineffective assistance of counsel contention is that his attorneys unreasonably failed to present exculpatory testimony by Stella Young, Patricia Young, Corey Briscoe, Sandra Smith, Howard Lewis Young, Sheila Dodson, and Kay Howell.**

(a)  The failure of defense counsel to call various witnesses[4] was asserted in both Rule 37 Petitions, although not all witnesses were included in both petitions.  Following the hearing on the First Rule 37 Petition, Judge Langston found that the defense decision not to call these witnesses was a tactical decision which would not support habeas relief.

On appeal, the Arkansas Supreme Court agreed, and noted that "Rule 37 does not provide a forum to debate trial tactics or strategy, even if that strategy proves improvident."  **Lee II**, **343 Ark. at 715, 38 S.W.3d at 343.**

The decision was the same on appeal from the Second Rule 37

---

[4]  These include Stella Young (Lee's mother), Patricia Young (Lee's sister), Corey Briscoe (a family friend), Sandra Smith (Lee's cousin), Howard Lewis Young (Lee's brother), Sheila Dodson (Lee's girlfriend), Jerry Johnson (a police officer), Lawanda Franks, Debbie Smith (defense investigator), and witnesses to show that Lee had income and to testify about the behavior patterns of crack cocaine users.

Petition.  **Lee III, 2009 Ark. 255 at 13, 308 S.W.3d at 605.**  In addition, the failure to call Stella Young as a mitigation witness in the penalty phase was also rejected because the Court found that Lee had instructed his attorneys not to call her.  **Lee III, 2009 Ark. 255 at 16, 308 S.W.3d at 606.**

(b)  When this Court considers the deference that must be given to a strategic decision such as whether to call a witness or not, and the deference that must be given to the Arkansas Supreme Court's decision to reject the claims regarding these witnesses, it finds no basis to conclude that the State court applied **Strickland** in an objectively unreasonable manner.  These claims are nothing more than attempts to second-guess counsels' strategic decisions.[5]  No showing of prejudice is made, and the decisions cannot be said to fall outside "the wide range of reasonable professional assistance."  These claims are without merit and will be denied.

26.  **Lee's second ineffective assistance claim is that his attorneys failed to highlight the absence of blood on his clothing when he was seen shortly after the murder occurred.**

---

[5] The Trial Transcript contains the following statement by Adams at the bench: "He has instructed me not to call his mother.  There are certain other family members which I have talked to:  Johnny and Charles Booker, Shelby Smith, Patricia Smith.  There was two or three other family members I frankly don't see any benefit in calling.  But he wants them called.  He also wants Lt. Jerry Johnson from Jacksonville Police Department.  And I in no way intend to do that.  I think it opens up too many doors for Ms. Lodge [the prosecutor].  And she's already beat us severely as it is.  I don't see any good that's going to come out of any of that.  I want to put on the record that is in fact his wishes.  There is a disagreement as to who to call.  Right now I'm trying to save  his life with the limited resources that we have available.  And he is not helping."

(a)   Lee raised this issue in both Rule 37 Petitions.  His contention is that the Reese murder was a very bloody one, and the absence of blood on his clothing when he was seen by witnesses shortly afterwards would have tended to exonerate him, *ergo*, his attorneys were ineffective for failing to highlight such absence.

(b)   Following the hearing on the First Rule 37 Petition, Judge Langston found that the attorneys' handling of this issue at trial was "purely a matter of trial strategy, and beyond the scope" of Rule 37.

On appeal, the Arkansas Supreme Court pointed out that Lee's attorneys had, in fact, made the argument that the two witnesses who saw Lee shortly after the murder testified that they did not see blood on his clothing.  The court also noted that the attorneys had not gone into more detail about the lack of blood because to do so might have opened the door to evidence of blood on a jacket Lee's mother was wearing on the day of the murder, which was similar to a jacket a witness had said Lee was wearing. The Court considered this treatment of the issue a matter of trial tactics which provided Lee "no ground for relief." **Lee II, 343 Ark. at 717, 38 S.W.3d at 344.**

Following a hearing in the Second Rule 37 Petition, Judge Langston found that no evidence had been introduced regarding this issue, and again held that it was a matter of tactics and strategy, not warranting habeas relief.

-47-

The issue was not raised on the Second Rule 37 appeal.

(c)   Respondent contends that the failure to raise this issue on appeal of the Second Rule 37 Petition results in a procedural default.   The Court does not agree.

The Arkansas Supreme Court did not vacate its decision on appeal from First Rule 37 Petition, which would have nullified that decision. **McKinney v. Arkansas Cardiology, P.A.**, **2009 Ark. App. 741, 1, 2009 WL 3644815 (Ark.App. 2009).**   Instead, it recalled its mandate, in effect reopening for further proceedings a decision that would otherwise have been final. **Arkansas Supreme Court Rule 5-3; Roberts v. State, 2013 Ark. 57, 4, --- S.W.3d ---, 2013 WL 543894 (Ark. 2013).**   It follows that Lee's failure to assert this issue, and others that will be discussed *infra*, on appeal from the Second Rule 37 Petition did not cancel out the fact that Lee did assert them on appeal from the First Rule 37 Petition, and they are not procedurally defaulted.

(d)   On the merits, Lee has shown nothing to overcome the deference due to the decision of the Arkansas Supreme Court on this issue, nor has he made any cogent argument showing that the court applied **Strickland** in an objectively unreasonable manner. This claim is, therefore, without merit and will be denied.

27.   **Lee's next ineffective assistance claim is that his attorneys failed to present evidence to rebut the three rapes used as aggravating circumstances in the penalty phase of the Reese**

**murder trial**.

(a)   This contention was raised in both Rule 37 Petitions. In the first, Lee contended, with regard to the Perkins rape, that his attorneys should have cross-examined the victim more vigorously and pointed out inconsistencies in her testimony.

With regard to the Dodd rape, Lee contends that his attorneys should have cross-examined the victim more thoroughly and pointed out that hair and fingerprints taken from the scene did not match Lee's.

With regard to the Smith rape, Lee contends that his attorneys should *not* have cross-examined the victim so thoroughly, *i.e.*, should not have asked Smith if she could identify her attacker.

Lee also contends that his attorneys should have called witnesses in defense of these rapes, given that the State had the burden of proving that Lee committed them.

(b)   The Arkansas Supreme Court rejected these arguments.  It noted that Lee had already been convicted of raping Perkins; that the outcome of the trial would not have changed even without the Dodd rape because there were other aggravating circumstances; and that Lee's attorney had a reasonable basis to expect that Smith would agree she could not identify her attacker.  **Lee II, 343 Ark. at 717-19, 38 S.W.3d at 344-45.**

The Smith identification issue was raised again in the Second

Rule 37 Petition, and again rejected.  On appeal, the Arkansas Supreme Court said that it was "not unreasonable for Adams to attempt to educate the jury that [Smith] had never been able to identify Lee as her attacker, even if the strategy 'backfired,' as the circuit judge found."  It also held that Lee had failed to show a reasonable probability that but for this identification, the jury would not have sentenced Lee to death.  **Lee III**, **2009 Ark. 255 at 21, 308 S.W.3d at 609.**

(c)  In his Habeas Petition, Lee contends that hair found at the scene of the Perkins rape, and hair and fingerprints at the Dodd rape scene, could not be linked to him.  He also contends that the identification question asked of Smith violated elementary rules of trial tactics -- questioning a witness whose testimony was not damaging and asking "one question too many" -- and cannot have been a legitimate trial tactic.

(d)  Lee's contentions are to no avail.  He does nothing more than once again suggest that different trial tactics might have been more successful, and fails to show that the Arkansas courts applied **Strickland** in an objectively unreasonable fashion.  This issue is without merit, and will be denied.

28.  **Lee's next ineffective assistance claim is that his counsel failed to offer evidence that the State had offered him life without parole in exchange for a guilty plea.**

Lee raised this issue in both Rule 37 Proceedings, and it was

rejected in both, albeit for different reasons.  The Court need not analyze the various arguments asserted and rulings obtained on this issue, however, because in fact Lee's attorneys *did* offer evidence during the penalty phase of the Reese murder trial that the State had offered Lee such a plea bargain, as Judge Langston found following the hearing on the Second Rule 37 Petition.

The offer is found at page 2456 of the transcript of that trial, and reads as follows:

> The second motion, Judge, deals with the plea bargaining aspect of the motions we filed we heard earlier today.  I know that ordinarily offers of plea are not admissible.  But we are in the penalty phase of this trial.  At the penalty phase Rules of Evidence don't apply to the defense in mitigation.  I want to offer in mitigation the fact the State has offered us prior to the jury going out an offer of life imprisonment without parole if the defendant would plead.  I think that's mitigation that I would like to have them put in the record, put in the record, a stipulation or I can call Ms. Lodge.

This motion was denied, and defense counsel made a proffer of the evidence.

There being no factual basis for this asserted claim for relief, it is without merit and will be denied.

29.  **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to seek remedial measures to counteract pretrial publicity.**

(a)  In his First Rule 37 Petition, Lee asserted that before and during the Reese murder trial there was "an enormous amount of media publicity" about all five cases against Lee, so great as to

jeopardize Lee's Sixth Amendment right to a fair and impartial jury.   Judge Langston denied this claim, finding no evidence that any juror was influenced by pretrial publicity and further, that the decision not to seek a change of venue was a matter of trial strategy.

On appeal, the Arkansas Supreme Court also rejected this claim, holding that the decision whether to seek a change of venue is a matter of trial strategy, and that Lee failed to present evidence that any juror was actually prejudiced by pretrial publicity.  **Lee II, 343 Ark. at 720, 38 S.W.3d at 346.**

Judge Langston's decision was the same following the hearing in the Second Rule 37 Petition, and the issue was not raised on appeal.   Although the matter was not reasserted on appeal, the Court finds it exhausted for the reasons set forth in ¶26(c), *supra*.

(b)  The Court has reviewed the transcript of Lee's trial, and notes that few of the jurors who went through the voir dire process had been exposed to publicity about the matter.  Those who had been so exposed could not recall what they had heard, saying things like "it was so long ago I don't remember" or that what they heard had "gone in one ear and out the other."

During trial, Judge Piazza cautioned the jurors appropriately before breaks about listening to publicity, and inquired upon their return whether they had heard anything about the trial.

There was no indication that such had occurred.

(c)   In view of this record evidence, there is no indication that the Arkansas courts made an unreasonable determination of the facts on this issue.  It is, therefore, without merit and will be denied.

30.  **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to object to Glenda Pruitt's testimony regarding Lee's alleged use of crack cocaine.**

(a)   During direct examination in the Reese murder trial, State's witness Glenda Pruitt testified, without objection, to seeing Lee shortly after Reese was murdered, and to a brief conversation relating to Pruitt's use of marijuana and Lee's use of crack cocaine.  Pruitt testified that Lee had told her he "likes crack cocaine."  On cross-examination, Lee's attorney asked Pruitt what she meant when she asked Lee "where's the fire," which appeared to relate to using marijuana.

On redirect, Judge Piazza found that the door had been opened to further inquiry along this line, and Pruitt testified that Lee had told her "I don't like weed.  I like cocaine"; that it was "running all through" him; and that he was "going to get some now."

Lee contends it was ineffective assistance of counsel to fail to object to the question on direct examination, and to go back to the subject on cross-examination.

(b)   Lee raised this issue in both Rule 37 Petitions. Following the hearing on the First Rule 37 Petition, Judge Langston found that the questioning of Pruitt was "clearly a matter of trial strategy," and that Lee had failed to show that an objection would have been sustained, or that he was prejudiced by the lack of one.

On appeal, the Arkansas Supreme Court echoed this finding, holding that counsel's intent to discredit Pruitt as being a drug user was "clearly a matter of trial strategy," and would not support habeas relief.  **Lee II**, **343 Ark. at 720, 38 S.W.3d at 346.**

Following the hearing on the Second Rule 37 Petition, Judge Langston found that Lee had offered no evidence that he was unfairly prejudiced by the lack of an objection to this testimony, or that such an objection would have been sustained. He again found the handling of Pruitt a matter of trial tactics and strategy which did not warrant habeas relief.

The issue was not raised on the second Rule 37 appeal, but the Court finds it exhausted for the reasons set forth in ¶26(c), *supra*.

(c)   Lee has shown nothing that would indicate that the Arkansas Supreme Court applied **Strickland** in an objectively unreasonable in dealing with this claim.  Attempting to discredit a witness by showing that she used drugs is a legitimate trial tactic.  This claim is without merit, and will be denied.

-54-

31.  **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to seek a mistrial when a juror was seen leaving the Judge's chambers.**

(a)  This issue arose when Lee's mother Stella Young saw a juror entering Judge Piazza's chambers during a lunch recess, and then leaving again fifteen to twenty minutes later.  Young testified that she told Qualls about this, and that Qualls told her the juror was merely using the telephone.

(b)  Lee asserted the failure to seek a mistrial on the basis of this situation as ineffective assistance of counsel in both Rule 37 Petitions.  Following the hearing on the First Rule 37 Petition, Judge Langston rejected the claim, finding no showing of any direct contact between the juror and Judge Piazza, and no evidence that a motion for mistrial was warranted.

On appeal, the Arkansas Supreme Court also rejected the claim, finding that Lee failed to show prejudice because there was no evidence as to what occurred in chambers even though Judge Piazza testified at the Rule 37 hearing and could have been questioned about the incident.  **Lee II, 343 Ark. at 721, 38 S.W.3d at 346.**

Judge Piazza also testified at the hearing on the Second Rule 37 Petition, and again, was not questioned about this issue.  Relief was again denied for lack of evidence, and the matter was not addressed on the Second Rule 37 appeal.  Despite this, the

Court finds it exhausted for the reasons set forth in ¶26(c), *supra*.

(c)  Lee's contention -- that because Judge Piazza  was seen leaving chambers after the juror had been there, improper contact must have occurred -- is nothing more than speculation, insufficient to sustain habeas relief.  The Reese murder trial took place before cell phones became ubiquitous, and use of chambers telephones by jurors was not an uncommon occurrence. Judicial chambers are multi-roomed structures, and contact between judge and juror was certainly not inevitable.

Moreover, even if the juror had entered chambers to talk with Judge Piazza, such contact would not necessarily have been prejudicial "improper contact" as urged by Lee.  The Supreme Court considered an *ex parte* communication between judge and juror in **Rushen v. Spain**, **464 U.S. 114, 117-19 (1983),** and "emphatically disagreed" with the lower court's holding that "an unrecorded *ex parte* communication between trial judge and juror can never be harmless error."  It said

> [t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial.  The lower federal courts' conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.

*Id.* **at 118-19.**

(d)   In the absence of evidence of improper contact, and in the face of **Rushen**, it cannot be said that the Arkansas courts applied Federal law in an unreasonable manner.   This claim is without merit, and will be denied.

32.  **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to support their motion to prohibit use of voter registration records to select the jury panel.**

(a)   Lee asserted this claim in his First Rule 37 Petition, where it was rejected because Lee failed to present evidence to support it.  On appeal, the Arkansas Supreme Court also rejected the claim, finding that Lee had failed to show how he was prejudiced by the lack of support for the motion, and that it was not ineffective assistance of counsel to fail to raise an objection when there is no chance it will be sustained.  **Lee II**, **343 Ark. at 722, 38 S.W.3d at 347.**

Lee asserted this claim again in the Second Rule 37 Proceeding, and Judge Langston again rejected it, both for lack of evidentiary support and because use of voter registration records had been upheld as an appropriate method of jury selection.

The issue was not raised on the second Rule 37 appeal, but the Court finds it exhausted for the reasons set forth in ¶26(c), *supra*.

(b)   The Court analyzed the substantive merits of this

-57-

argument in ¶17, supra, and found it without merit. Based on that analysis, the Court finds that the Arkansas Supreme Court did not apply **Strickland** in an objectively unreasonable fashion when it denied the argument couched in terms of ineffective assistance of counsel. This claim is without merit and will be denied.

33. **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to conduct an investigation into Judge Piazza's personal relationship with a Prosecuting Attorney.**

(a) Lee asserted this claim in the First Rule 37 Petition, where it was denied it, based on the lack of any evidence that Lee's attorneys were aware of any such relationship. The Arkansas Supreme Court agreed. **Lee II**, **343 Ark. at 722, 38 S.W.3d at 347.**

The claim was not addressed in this form in the Second Rule 37 Petition, where Judge Langston considered only whether such a relationship existed, nor was it raised on the second Rule 37 appeal, but the Court finds it exhausted for the reasons set forth in ¶26(c), *supra*.

(b) The testimony of Lee's attorneys in connection with the First Rule 37 Petition was that they were unaware of the alleged relationship, and Lee offers nothing that would counter such evidence. That being so, it cannot be said that the Arkansas courts made unreasonable factual determinations when they found no evidence the attorneys were aware. And in the absence of any

evidence that might have raised a question in the minds of Lee's attorneys about a personal relationship between Judge Piazza and Larue, it cannot be said that either Judge Langston or the Arkansas Supreme Court applied **Strickland** in an objectively unreasonable fashion in dealing with this claim.  The claim is without merit, and will be denied.

    34.  **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to object to improper and inflammatory closing remarks  by the State.**

    (a)   In her closing remarks, Lodge referred to Lee as a "hunter"; Jacksonville as his "habitat"; and the people of Jacksonville as his "prey."  In her rebuttal, she said "Mr. Adams finally says, who are we, referring to us, I guess, referring to you specifically as jurors, who are we to determine when a life should be taken?  Ladies and gentlemen, I will tell who we are.  We are the hunted."  Lee's attorneys did not object to this line of argument.

    (b)   The failure to do so was asserted as ineffective assistance of counsel in both Rule 37 Petitions.  At the hearing on the First Rule 37 Petition, Adams testified that he would have objected to the argument if he had heard it, but that he "just missed it."

    Judge Langston denied Rule 37 relief, ruling that while the argument was improper, "it was not one which would have inflamed

the passion of the jury to such a degree that the outcome of the proceeding would have been any different had the remark not been made, or had been objected to, and the jury admonished to disregard it."

On appeal, the Arkansas Supreme Court agreed that the argument was "objectionable," but found no prejudice.  The court said that "[g]iven the nature and strong evidence of guilt the jury had already heard, both during the guilt phase and the sentencing portion of Lee's trial, it is unlikely that the additional comment -- albeit an objectionable comment -- was the determining factor in the jury's decision to impose the death penalty on Lee." **Lee II**, **343 Ark. at 723-24, 38 S.W.3d at 348.**

On appeal of the Second Rule 37 Proceeding, the court made the same decision, noting that the jury had

> heard testimony of the violent nature of the Reese murder during the penalty phase and also heard testimony that Lee had raped three different women in Jacksonville.  Under these circumstances, we conclude that Lee has not met his burden to show that there is a reasonable probability that the jury would have imposed a different sentence if Adams had objected to the prosecutor's statement.

**Lee III**, **2009 Ark. 255 at 19, 308 S.W.3d at 608.**

(c)  Under **Strickland**, to prevail on this claim Lee must show that the objectionable comments were so serious that they deprived him of a fair trial.  Lee has failed to make this showing, and the Court concludes that it cannot be said that the Arkansas Supreme Court applied **Strickland** in an objectively unreasonable manner in

-60-

denying this claim.  The claim is without merit, and will be denied.

35.  **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to advance the correct theory to support his objection to the State's use of victim impact evidence.**

(a)  Lee argues that his counsel should have made a relevancy-based objection to the victim impact evidence introduced at the Reese murder trial.  He derives this claim from a concurring opinion in his direct appeal, **Lee I**, **327 Ark. at 706, 942 S.W.2d at 238 (1997)** (Newbern, J., concurring).

(b)  Lee asserted this claim in both Rule 37 Petitions.  In the First, Judge Langston denied the claim, finding no evidence that a relevancy objection would have altered the outcome of the trial.

On appeal, the Arkansas Supreme Court also rejected the claim, as there was already authority approving the use of victim impact evidence.  The objection would, therefore, have been meritless, and it is not ineffective assistance of counsel to fail to make a meritless objection.  **Lee II**, **343 Ark. at 724, 38 S.W.3d at 348.**

Judge Langston also denied this claim in connection with the Second Rule 37 Petition, for the same reason, and the denial was not appealed.  The issue was not raised on the second Rule 37

appeal, but the Court finds it exhausted for the reasons set forth in ¶26(c), *supra*.

(c)  Lee makes no showing that if his attorneys had made a relevancy objection to the victim impact evidence it would have altered the outcome of this case. Justice Newbern's argument did not prevail in Lee's direct appeal, and has continued to be rejected. *See, e.g.*, **Roberts v. State**, **2013 Ark. 56, 4, --- S.W.3d ---, 2013 WL 543892 (Ark. 2013)** ("victim-impact evidence is relevant evidence that informs the jury of the toll the murder has taken on the victim's family").

(d)  Under these circumstances, it cannot be said that the Arkansas Supreme Court applied **Strickland** in an objectively unreasonable fashion in dealing with this claim.  The claim is without merit and will be denied.

36.  **Lee's next ineffective assistance argument is that his attorneys were ineffective for failing to raise and preserve a claim that the amount of time condemned inmates are forced to spend on death row amounts to cruel and unusual punishment in violation of the Eighth Amendment.**

(a)  Lee raised this claim in both Rule 37 Petitions, and it was rejected in both.  In the First Rule 37 Petition, Judge Langston pointed out that the claim was not based on existing precedent, and that an attorney is not ineffective for "failing to raise every novel issue which might conceivably be raised."

On appeal, the Arkansas Supreme Court also found that this was a novel claim, and that the failure to raise it was not ineffective assistance of counsel. **Lee II, 343 Ark. at 725, 38 S.W.3d at 349.**

Judge Langston made the same decision in the Second Rule 37 Petition, and the issue was not asserted on appeal.  The Court considers the claim an exhausted one, for reasons set forth in ¶26(c), *supra*.

(b)  This claim was described in **Lackey v. Texas, 514 U.S. 1045 (1995)** (memorandum of Stevens, J., respecting denial of certiorari). Justice Stevens (joined by Justice Breyer) considered it a novel claim, but not without foundation, and  concluded his memorandum by noting that the Court's denial of certiorari does not constitute a ruling on the merits.  Often, a denial of certiorari on a novel issue will permit the state and federal courts to "serve as laboratories in which the issue receives further study before it is addressed by this Court." *Id.* **at 1047** (internal citation omitted).

Notwithstanding this invitation, although the issue has reached the Supreme Court many times it has never commanded a majority.  Perhaps this is because of the irony inherent in the argument, as succinctly described by Justice Thomas in **Johnson v. Bredesen, 558 U.S. 1067 (2009):** "There is simply no authority 'in the American constitutional tradition or in this Court's precedent

for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed'."

(c)   For these reasons, it cannot be said that the Arkansas Supreme Court applied **Strickland** in an objectively unreasonable fashion in rejecting it.   The claim is without merit and will be denied.

37.   **Lee's final claim is that the cumulative error doctrine should be applied to the various errors he alleges were made by his attorneys.**

(a)   This claim was raised by Lee in both Rule 37 Petitions, and rejected in both.   Following the hearing on the First Rule 37 Petition, Judge Langston ruled that Lee had not identified any errors which would justify habeas relief.   On appeal the Arkansas Supreme Court agreed.   **Lee II**, **343 Ark. at 726, 38 S.W.3d at 349.**

In the Second Rule 37 Petition, Judge Langston made the same ruling, and that decision was not appealed.   The Court considers the claim an exhausted one for reasons set forth in ¶26(c), *supra*.

(b)   The Eighth Circuit has repeatedly rejected the notion of cumulative error as a basis for habeas relief.   See **Middleton, *supra*, 455 F.3d at 851** (accumulating cases).   Neither the conclusions of Judge Langston, nor that of the Arkansas Supreme Court, are contrary to Eighth Circuit law on this issue.   This claim is without merit and will be denied.

## V.   CONCLUSION

38.   Based on the foregoing analysis, the Court finds that Lee has failed to establish his entitlement to a writ of habeas corpus pursuant to **28 U.S.C. § 2254**.   His **Petition For Writ Of Habeas Corpus** (document #1) is, therefore, **denied.**

**IT IS SO ORDERED** this 18th day of June, 2013.

 /s/ Jimm Larry Hendren
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT JUDGE**